2016-14-49, Mr. Hangardner. Thank you, Your Honor. May it please the Court, I'm John Hangardner on behalf of Sonix Technology. We're here today looking at a case under the Nautilus Standard, which is pretty often recited these days, but just to keep it all clear before us, the inquiry is whether the claims, not just a particular term in the claim, but the claims read in light of the specification delineating the patent and the prosecution history fail to inform with reasonable certainty those skilled in the art about the invention. There's a lot in that, and there's additional statements from the Supreme Court in Nautilus that are important to keep in mind, I think, particularly in this case. The standard, as the Supreme Court said... Your problem, though, isn't the word visually subjective? It is, Your Honor. There are different visual abilities. Your Honor, like many terms and claims, it is subjective, and I think the term subjective-objective has become sort of a buzzword on the defendant's side in this case, and I think that's where the district court got a bit tripped up, frankly. This court has routinely upheld claim limitations that are subjective, and we talked about a number of these cases, but we can go all the way back... I'm not sure that you're making the distinction you want to make when you embrace the term subjective to refer to things like substantial or other words like that. They're not subjective in the sense that I think the most troublesome cases that you have to deal with, like interval licensing, they don't have to do with interior mental states. No, and neither does this... They have to do with judgments of various sorts. Subjective is not making, it seems to me, the distinction on which your argument on appeal turns, that perceptual abilities do not have to do with interior mental states. They have to do with the normal range of the physical capacities of human eyes, and it probably excludes Ted Williams, but except for Ted Williams, who had extraordinary vision at the plate, there's lots of objective information about what human eyes can see. And Your Honor, I agree with you that subjective is a bit of a distraction, but where we disagree is that the visually negligible standard is an internal human state any more than any of these other claim terms that we're talking about. If you look at the DDR Holdings case, that dealt with visual perception. In DDR Holdings, there was a specific finding that there was a known standard in the industry, that the terms, even though they looked somewhat, and I'm going to use your words, but subjective, they were terms that those in the arts could easily apply and had a known standard. And here, you have your expert testifying that there is no technical standard that he knows of, and he said, you know, I just look, and if it crosses my threshold, then it's visually negligible. I mean, that's difficult testimony for you to get around. Your Honor, that testimony should be viewed in context, and if we're going to consider, if the court's going to consider the extrinsic evidence in this case, it should not consider that testimony in reaching its decision, yet it talked about that testimony. If the extrinsic evidence is going to be considered, that should come after we look at everything else involved in this case, and I do think it's critically important to heed the Supreme Court's guidance that certainty must be viewed in the context of the subject matter of the invention that we're talking about. But we did say in interval licensing that there need to be some kind of objective boundaries, so what are the objective boundaries for visually negligible? The objective boundaries are established in the specification through a series of factors and criteria that are laid out in substantial detail, unlike interval licensing, where it was a muddled specification with different embodiments, and it was unclear whether the unobtrusive language applied to which embodiment. I don't see substantial detail in the specification, so why don't you point to me your best places in the spec that you think, or in the written description that you think, satisfy the objective boundary requirement of interval licensing. Absolutely, Your Honor. I would like to actually, well, I'll go directly to the specification and maybe come back to the claim language. Within the specification, certainly the clearest delineated section of discussion is in column four, line 60, through column five, line 15, which are the detailed examples and laying out the factors affecting visual negligibility. The actual text calls it out, as these are what the practitioner needs to be aware of in understanding visual negligibility. It identifies three factors, differentiation of graphical indicators, the ability for a person to visually differentiate between the graphical indicators, and it says that they should not be differentiable to a person. It refers to the brightness of the graphical indicators on the page and to the homogeneity of them. So, in other words, a homogeneous pattern is less obtrusive than a non-homogeneous pattern. And then... You really want to use the word obtrusive? Well, this is how it's described. I'm using the language from the specification and it uses this language, but it goes then into the particular objective characteristics that are used to understand this. And it talks about the size of the dots, the size of the state zones that contain those dots, the relative size of the dots as compared to the state zones, and it gives, we'll talk about specific embodiments where it provides percentages. It talks about the shape of the dots themselves, the density of the dots, how closely packed they are, the pitch. Can a claim mean different things to different people? No, it cannot. A claim must mean the same to all people, and that's the reason that the specification includes these objective criteria, is to provide that level of guidance to a person of skill in the art. And it not only provides them in the abstract, in terms of the number of dots, the density of dots, and these other factors, it provides two very specific, very concrete examples that are directly linked to visual negligibility. It flat out says that two embodiments will result in visually negligible graphical indicators, and those embodiments have a lot packed into them. In the first embodiment, each square centimeter of the selected zone on a surface includes more than 3,000 state zones. So it's defining a size of, one square centimeter has 3,000 state zones. It's giving you a precise size requirement. Yeah, but those limitations aren't in the independent claims, are they? No, those limitations are in the two dependent claims, 60 and 77. But they also inform, again, and this is why I emphasized the language from Nautilus. We look at the claims as a whole, so this language in the specification and in the claims as a whole informs the understanding of the person of skill in the art. But the independent claim, by definition, has to be broader than the dependent claims. It is, and so the claim is not, the independent claim 9, for example, is not limited by these constraints, but they do inform the person of skill in the art the meaning of this visually negligible requirement by providing criteria. This is exactly the same situation that is in EIVL process. If you look at the claims in EIVL process, it talks about a substantially higher elevation. Well, what does that mean? That may not be an observation made by a human being, but the determination of what is substantially different is a human, it could vary from human to human. If you take 10 people and put them in a room and ask if a particular line is substantially higher at one end than another, you may get 10 different results. There is the same level of uncertainty in the EIVL process situation as is being complained of here. But again, as here in EIVL process, the Supreme Court relied on the fact that substantial elevation was described in the patent itself, in the specification, gave two examples, exactly like we have here. One of them described a degree of four degree elevation change, and the other described a 12 inch elevation change. The Supreme Court did not limit the claims to those particular elevation changes, but the Supreme Court very clearly said those examples provide exactly the sort of guidance to persons of skill in the art, so they understand what these claims mean, they understand the scope with the reasonable certainty that the Supreme Court demands. And the same is true here. Now, in that case, it didn't have even as much detail in the EIVL process case as we have here. Because again, these examples go into excruciating detail about the size of the state zones, the ratio of the size of the dot to the state zone. And this patent also has the same additional context that was so important to the Supreme Court EIVL process. The Supreme Court goes out of its way to describe the fact that persons of skill in the art understand these things, they know how to apply these things. Right, but you didn't have any testimony that persons of skill in the art did understand these things. In fact, you had your own expert essentially saying, well, I just use my own personal standards. That doesn't say anything about what those reasonable skill in the art understood. Again, if we're to go to the extrinsic evidence, Dr. Shook's testimony is actually much more complex, much more involved in that. That's one statement out of it. He says very repeatedly that this is a repeatable, understandable standard that people of skill in the art do understand what this means. There is not a number I can attach to it, like so many, like almost every claim that exists that I've certainly ever litigated in my life. I can't say that X equals seven, therefore it infringes. We don't have that situation ever in patent cases. The same situation here. Yet, persons of skill in the art understand the meaning. It's also, I will say, and I see I'm into my rebuttal. So what construction would you give to a jury? That it should be given its ordinary meaning. And that's what the party stipulated in this case. They're visually negligible. This issue came up after the close of Discovery, when they had raised a hundred other indefiniteness issues other than this one. But it came up because of the arguments that you were making. No, Your Honor, it did not. And this is another, this was spun up in a deposition after it had never been raised with an expert who had not even been prepared for this topic because there had never been a dispute. Both experts in this case from day one agreed that the accused products were visually negligible and there had never been an indefiniteness issue raised. Now, not only that, their expert's testimony in his opening report was that it's easy to figure out how to make something that is visually negligible. You just control the dot size and the brightness. And we've cited that in our brief to their expert's own testimony, explaining how to make something visually negligible. It was a well-understood concept. It's also reflected in the L'Amour decision, of the L'Amour prior art. And in other prior art discussed, Yamaguchi discussed by Mr. Angles, he discusses how L'Amour explains visually negligible. Their expert, Mr. Angles, discusses how Yamaguchi explains visually negligible. He applies it in the context of the prior art. He applies it in the context of the accused products. He understands it perfectly well. This is an issue that was created, for lack of a better word. There is no zone of uncertainty, such as the Supreme Court was concerned about in this case. This is an issue that has no bearing on anything in this case. There's never been a dispute about the accused products. And there is no zone of uncertainty. How do we pronounce your name? Coring is fine. Thank you. Good morning, your honors. May it please the court. My name is Jacob Coring. I'm here with my colleague, Terence Sheehan. Together, we represent the defendant's appellees, PIL, and its customers. The district court here correctly found the term visually negligible indefinite, based on the admitted points that the claim term visually negligible is subjective, and it lacks any sort of objective standard against which to measure that subjective standard. Now, I heard counsel here talk a little bit about the term subjective and that there being some information in the specification. Let's be absolutely clear. The standard against which this claim is measured is the standard that counsel for Sonics testified to the told the district court. And that is that visually negligible means something that is visible, but that does not interfere with the user's perception of the main information. In other words, that's functional. It's functional. It's not really subjective. It's something whatever works for its intended purpose. Well, in this case, I think, your honor, it is subjective. In other words, that might be definite. If it were functional, perhaps it might be definite. But the issue here is that the baseline standard against which we're measuring whether or not these dots are sufficiently non-visible is from the user's point of view. And as Dr. Ashok, Sonics' expert, testified, there's all sorts of issues that address whether or not a person is going to be able to see the dots. Now, these claims have gone through re-examination twice, haven't they? Yes, your honor. And this issue was not fatal to them. So what I would say, your honor, is the issue of indefiniteness wasn't raised at the time, probably because the standard at the time was not the Nautilus standard. It wasn't this reasonably certain standard that we have right now. It was the old insolubly ambiguous. But indefiniteness has always been part of the law. And whether the Supreme Court changed the lingo or not, indefiniteness was still an issue. Yes, your honor. And to be honest, we believe that even under the old insolubly ambiguous standard, the same way that the aesthetically pleasing term was found indefinite and datamized, this term should probably be found indefinite under that. Whatever else this is, this is radically different from aesthetically pleasing. That's a matter of in the absolute core meaning of that. That case is completely irrelevant to this. The interval licensing is at least in the general field. But this has nothing to do with aesthetic taste or preference. This has to do with what the eye can see in the presence of a particular object. Your honor, I— I'm not sure that that's subjective at all. Your honor, I agree with you that the main—the case here that is most on point is interval licensing. And I know that your honor is familiar with that case. The reason that we talk about this in terms of subjectivity is because the evidence that was developed as a part in this record points to how we determine whether or not these dots are visually negligible. And none of the experts had the slightest difficulty in doing that here, right? Yes, because they each said they were applying their own personal opinion in doing it. The ultimate problem, your honor, is that— So why is it that your expert in the beginning felt that these accused devices did meet the standard and yet your light bulb didn't go off until their rebuttal expert talked about the prior art? Your honor, the light bulb probably should have gone off a lot sooner. But I think the reason that it didn't—it didn't get raised as an issue is because the contentions in this case were unfortunately a little vague. And the issue of whether or not the prior art in this case showed visually negligible dots just wasn't raised by Sonix or its expert until the rebuttal expert report in—at the end of July of last year, or at the end of June of last year. And it was only once that—and the issue of whether or not the prior art showed visually negligible dots was never argued by Sonix at any part of the case. So you're saying everyone assumed that both the accused products and the prior art all satisfied the visually negligible— That's right, your honor. And there were a lot of issues, and many of those issues were joined. But because that dispute was not identified until the rebuttal report from Sonix's expert, that was the first time that he said, well, these dots, maybe—those dots, those don't look visually negligible. Maybe those are—are obtrusive. Maybe they get in the way. And when we asked Mr.—Dr. Ashok, tell us why you believe that those dots in the prior art are not visually negligible, he—that's when he started stating his standard as being, well, it's from my own personal point of view.  I mean, if you were asked a question like that, unless you had been prepared in advance to go and figure out what in the science of human cognition taught about measurements to which numbers could be attached, you would say exactly the same thing. It's perfectly clear. That's not interfering with that. What else do you want me to say? You never raised this before. And you might even kind of use the word subjective in a loose, you know, imprecise sense, a term that can cover a lot of different things, from things that have nothing to do with human capacities to things that have to do with mental states as opposed to the properties of the physical organ of the human eye. So the idea that you build a whole theory around a casual set of observations in a deposition, which was not even about that subject, I mean, it seems to me it doesn't even tell you that there isn't, in fact, somewhere in the literature a way of attaching numbers to this, let alone whether anybody would need to attach numbers to figure out in any given case whether something was visually negligible or not. Well, I think, Your Honor, the problem with that line of thinking is that it assumes that there is a standard. And it assumes that that standard can be met somewhere, can identify the point where dots go from negligible, I don't see them to the answer. What is the art here? What is the field, the art here that we're dealing with if you'd say a person of ordinary skill in the art? What's the art? A person of ordinary skill in the art in this case would probably be somebody, an expert in printing, and would understand how to, bring information onto a sheet of paper and identify what information you want to demonstrate and what you want to show and what information you want the user not to notice. And do you think a person of ordinary skill in the art, a printer, would benefit from, or even in the ordinary course, look to some psychological metric that spoke about the properties of the human eye in deciding whether something is visually negligible? Or do you think that maybe virtually every printer in the world would look at something and say, yeah, that's a problem, or no, that's not a problem? I think to answer your question, I don't know the answer to your question, but I do know this. There's probably a threshold below which everybody, nobody is concerned about dots interfering with other information on the page. For example, invisible dots. It's possible to print dots in infrared reflective ink, and those dots are not, would not interfere with the other information on the page. But at what point in time do we increase the visibility of the dots, or how big do the dots need to be, or what does the pattern need to look like, or what ink do we use? At what point do we cross the threshold where a user's perception- And how do we know on this record that basically every relevant person wouldn't agree about that? Well, we know on the record that right now, we have two experts who took a look at one critical piece of prior art, and one said, those dots are not visually negligible, and the other one said, well, they clearly are. And that is the crux of the issue that was raised that caused this issue to be raised in front of the court. So is it your position that to the extent experts would disagree around the fringes, even if everybody could agree as to some central core of visual negligibility, that it has to be indefinite if there is even this fringe portion that the experts are gonna disagree on? Not quite, Your Honor. Here's what I would say, is if there was some sort of standard, universal standard, or some reference I could go to that might identify this is the way that eyes work, and this is the data that's on a piece of page, and this is the level of printing below which eyes don't optically recognize those dots, then I think experts can disagree about whether or not it meets that standard. But if you've got two experts who come in and say, well, I think these dots are visually negligible, and the other expert comes in and says, I think that they're not, and the reason that they're saying that they disagree is because, well, because I think it is visually negligible based on my own perception. And then the other expert says, well, now mine is based on my perception. That's not the kind of dispute that shows a definite claim. It's the kind of dispute that illustrates that the underlying claim itself has indefiniteness issues that we can't resolve without some additional information, none of which is on this record or was in front of the district court. I'm having trouble imagining the printer, that's the audience for this patent, going out and looking at highly complicated psychologist literature, the psychology is even the right field, about the capacities of the human eye as opposed to looking at the thing. Well, here's what we know based on the record in front of us is that there was a piece of prior art, the L'Amour piece of prior art, and it stated the intent of this piece of prior art is to put information on top of a map, underneath the map, that can be read by an optical pen and that we don't want that information to interfere with the usability of the map by the people who use the map. And Sonic's expert came in and said, well, I'm taking a look at those dots and those dots are not visually negligible. Well, hold on a second. If indeed all that was required of the L'Amour inventor was to say, if all I want to do is print these dots, and look, everybody understands how this works. This is something that's just common sense. I can take a look at it. Then Dr. Ashok should have said, look, common sense. They said that they did not want those dots to be seen. They obviously printed them at a level that was appropriate. And he should have said, based on that, that standard, then those dots are visually negligible. But instead he came in and he said, there's all sorts of things here that I'm looking at, my personal view of this, that affect whether or not I believe this is visually negligible. Many of those items, by the way, are not listed in the specification at all. Things like the particular pattern, whether or not there's lines in between dots, other kinds of issues that he raised that were particular to him. Mr. Corwin, what about Claims 60 and 77 that have more definiteness? I'm sorry, Your Honor, could you repeat that? Claims 60 and 77 are even more definite. So Claims 60 and 77, first of all, just to address the issue up front, those claims, any argument relative to those claims was waived by Sonex at the District Court. I understand they disagree with that, but it's pretty clear if you take a look at the record, they failed to raise it timely at the District Court. They failed to raise- Well, the District Court found waiver, right? The District Court did find waiver, yeah, based on the fact that they raised it for the first time at oral argument three months after briefing was done. And then in this court, they didn't address waiver in their opening brief. They didn't cite the appropriate standard, which is abuse of discretion. They didn't offer any argument or case law regarding why she might have abused her discretion. So the issues of 60 and 77 just frankly aren't in front of this court. That being said, even if they were in front of this court, or even if we were to consider that argument, the issue about the additional density limitations, first of all, I think Sonex cites in its reply brief to Halliburton note three, which relates to the issue of claim differentiation. And what claim differentiation tells us, and what that note from Halliburton tells us, is that if we add this additional limitation in a dependent claim, the assumption is that it doesn't define the information in the independent claim. It's a new piece of information. So they cite it for the wrong purpose, but it helps illustrate how those density limitations don't help define objectively, or I'm sorry, visually negligible in this case. Those additional limitations, and as the expert told us, there's lots of different considerations when we print. One of them is, for example, ink. And for example, if I were to print a dot pattern that met the density limitations in claim 1677, but I printed it super dark with the intention that everybody would see it, do I infringe that claim? I don't know, because the test here, and the standard here, depends on who is viewing the dots and their subjective view, their personal view of what they think those dots look like. Sometimes I find it helpful, and I think most of us do, in thinking about whether something is definite, is to ask the question, how else might they have drafted their claim to eliminate, to be more definite? How do you think they might do that in order to capture their invention? I think, you know, not capture it in a way that doesn't trivially allow an end run. I think they could have done what Sonics explicitly told the district court they didn't do, which was they could have provided an example in the specification, and then limited the term visually negligible to that example, or at least provided some structure within the specification that those of ordinary skill in the art could look to, to find a repeatable, accurate application of the claim term, and to figure out its objective. Or 1677 were independent claims without reference to visual negligibility. Yes, Your Honor. I think if they eliminated visual negligibility, and just had those limitations in Claim 1677 without having that subjective, indefinite term in it, yes, then those claims would probably have been definite. Thank you, counsel. Mr. Hancock has a little rebuttal time. Thank you. Just to touch on that last point, there's absolutely no evidence that it would be possible to make a dot pattern that satisfied the requirements of Claim 1677 that would not be visually negligible. That just is not something that's been touched on. There's no evidence for or against that. So anything we've heard on that is just counsel's argument. I think it's also really important to understand that there was no disagreement, as described by counsel, between the experts here. Again, this case doesn't turn on expert testimony. It can be fully understood within... Well, he referred at one point to there was a particular, I'm going to call it a picture, pattern or something, whatever it is. And your guy said negligible. The other guy said not negligible or the reverse. Was there such an incident, a particular pattern on which the experts disagreed? No, and I'll explain why. Thanks. The expert, Amit Ashok, the expert for Sonics, agreed at all points that the Lemoore reference discloses the concept of visually negligible graphical indexes, dot patterns. And there's never been a dispute that that idea of making the pattern visually negligible so it doesn't interfere with the map was part of Lemoore. What Mr. Ashok did testify was that one of the embodiments in Lemoore, the checkerboard pattern, might not result in a visually negligible pattern because it was contrary to some of the instruction of Lemoore himself. Lemoore placed a big emphasis on an isotropic distribution of dots. And Mr. Ashok was simply pointing out that that's not an isotropic distribution. But he didn't say they might not. He said they tend to make more visible to the reader's eye. Yes. And he used the phrase visually intrusive. Yeah, tend to make it visually intrusive. He did not say that it couldn't be visually negligible, but he did say it could become visually intrusive. And that was his concern. And that was actually reflected in the second re-examination, the testimony of Mr. Syreson, the printing expert that Sonics offered to the patent office and that resulted in the issuance of the re-examination certificate. That he testified at length about that checkerboard, or not at length, but he testified about that same checkerboard pattern. And this issue of visual negligibility was central to the dispute regarding Lemoore in the re-examination. Dr. Ashok's testimony related to that same issue. Mr. Angles, their expert, did not ever say that every one of the Lemoore patterns was always going to be visually negligible. There was no testimony on that by Mr. Angles. He just said the same thing that Dr. Ashok said. Lemoore discloses the concept of visually negligible. OK, I just want to nail this down because one of the very most concrete things your friend on the other side of the aisle said was, as I heard it, there was a pattern. The two experts looked at the pattern and they disagreed about whether that pattern was visually negligible. Is that true or not true? Not true. Counsel, what is not indefinite is your timing. Thank you so much. Thank you. We'll take case under advisement. Thank you. All rise.